All right, then Garland Wilfong v. Tharco Packaging, 15-55473, 15-56000, and you have 15 minutes each side. I'd have been happy to talk about the other case, but I wouldn't have known anything about what was going on. So, good morning, Your Honors. Well, hopefully you know more about this one. Most definitely. So, may it please the Court if I might begin. My name is Martin Ahrens. I represent Mr. Wilfong. Thank you. As we see it, there are basically two main reasons the trial court's grants of summary judgment must be overturned. The first reason is that the lower court took all the evidence in the light most favorable to Tharco on all the issues, the existence of Mr. Wilfong's disability, his CFRA leaves, the adverse employment actions, and the causal connections between the two. That's the first reason. The second reason is the district court ignored and disregarded the evidence of both discriminatory and retaliatory animus when, in fact, there was both substantial direct and circumstantial evidence of Tharco's discriminatory and retaliatory animus towards employees, and specifically Mr. Wilfong, for having used his FMLA leaves. See, management was clearly frustrated, antagonistic, and fed up with employees like Mr. Wilfong who were using FMLA leaves. And what they did was they took an otherwise ordinary violation that might have been an ambiguous violation about whether or not it was a lockout, tagout violation, or if it was a safety violation, or just a violation of procedures. And with that ambiguity, they went to the harshest extreme to terminate him. And why did they go to that harshest extreme? Mr. Ahrens, can I ask you a question? Of course. I'd like to see if I've got the facts straight. Regarding the lotto violation, the claim is that Mr. Wilfong had placed a cardboard piece on some rollers and had taken a nap. And my question to you is this. Were those rollers, as I've read the record, next to a conveyor belt? The rollers were at the end of a conveyor belt system. And if you... It's the sort of same thing that when we go through TSA at the airport, there's some rollers and then there's a conveyor belt, right? A very good analogy. Yes, Your Honor. All right. So he's lying on a cardboard box next to a conveyor belt, which could be activated at any time because he hasn't turned it off. Is that a pretextual reason for firing him? That's actually not true. It was turned off and it couldn't have been turned back on. And everybody said that they didn't know, the lockout, tagout, person most knowledgeable, the maintenance supervisor, everybody said they didn't know what was a lockout, tagout. So that in and of itself is not a pretextual reason. That's their alleged reason, their proposed legitimate reason. And then the burden shifts to the plaintiff to say, is there any other reasons? And we thought, and we have presented substantial evidence that is either direct evidence or at least circumstantial evidence, that the reason they turned what would otherwise be an ordinary safety violation into a lockout, tagout is because Mr. Aguirre and Mr. Stingley and Ms. Lima all made negative and derogatory statements about people who use FMLA. Mr. Ahrens, where in the record can I find evidence that the conveyor belt was turned off, not by Mr. Wilfong, but by somebody else? Well, no, Mr. Wilfong worked on that machine and he is the one and he testified in his deposition, which is in the record, that he turned off the switch. He also testified that he put a sheet of cardboard down, which covers the optical eye. And so this is an open facility. It's even bigger than this courtroom here. And anybody who was walking by would have seen him. And in fact, the person who did see him thought that it was such an unsafe situation that he walked away. The deposition that Mr. Wilfong deposed and said that he had turned off the conveyor belt before he went to take a nap on the cardboard? Yes, he did. Can you give me a citation to that, please? I can, if you give me just a second. While I'm looking for that citation, do you mind if I, because I can, I want to kind of multitask here. Do you mind if I address the question that the court had presented? If you want to give me the citation on your rebuttal, that's fine. I would love that if I could, Your Honor, if I may. I will find that citation because I know it's there. Maybe while you're doing that, I think that you also noticed, I know they had, I don't know, you call them the most knowledgeable person or whatever, the person that was in testified, I believe, somewhere. Maybe you can give us that record site as to that it wasn't clear whether this was a lockout violation or not. Yeah, and I notated that. That's at 3 ER 426 and then again 429 to 430. So he said, if I understand correctly, they conceded that it wasn't technically, it didn't fall within the terms of their lockout tagout manual as to what constituted a lockout tagout violation. But he said that people were trained, their employees were all trained in a way that would show that this was a lockout tagout violation. Well, we think that that's a disputed issue of fact. I think the policy manual itself, number one, not only does it not technically fall in, it doesn't fall in at all because the manual talks about training for servicing, cleaning and repairs and maintenance. And what their person most knowledgeable about lockout tagout and their maintenance supervisor who does those trainings, what they both testified to and I asked them, what should he have locked out tagout? And Mr. Torres said, there's nothing there to lockout tagout. And Mr. Harrington, their person most knowledgeable from Idaho who flew in for his deposition said, I asked him, after knowing everything that you know now, we spent this whole deposition, it was the very last question in my depot, what should he have locked out tagout on the equipment? He says, I don't know. And in fact, Mr. Geary, who harbored that discriminatory and retaliatory animus about people with FMLA saying, let's stick with the points, Mr. Wilfong is abusing his FMLA, that we need to involve corporate and challenge these things. Basically what he told when he called Mr. Harrington at that time in July of 2013 was, I think we've got a lockout tagout violation. And Mr. Harrington, that's all he could recall from the conversation. He said, yeah, that's fine, I agree. But Mr. Geary didn't give him any of the details or any of the circumstances. He did nothing to kind of investigate, to really determine what it was. And I think all these questions kind of show that there's a disputed fact about whether or not this really was the reason that they did it. Or since Mr. Geary knew that his next one would send him right out, this was an easy way to get rid of an FMLAer. Did they do it right away? Yes, it was within that couple of weeks. Okay. And it was a short period of time. Hi, Mark. How do you distinguish rope versus autoclore system of Washington, Inc., which concluded that a request for an accommodation without more is not a protected activity to support a claim for retaliation in violation of California FEHA? Okay, so first I want to point out that that has nothing to do with the CFRA retaliation or the CFRA interference claims. And what rope says is that This is just the FEHA retaliation. This is just the FEHA retaliation. All right, so, I mean, do you concede that you can't state a cause on just that? No, because here's why. Because this case is different than rope, and it's different than Moore. This case is more like the Castro-Ramirez case that came out. So rope says a request for an accommodation isn't a protected activity. Then the legislature changed the law, and then Moore said it was a change. It's not retroactive. And so our facts are under the rope analysis. So then the question becomes, did Mr. Wilfong do more than simply request an accommodation? And here, he opposed the discipline that they gave him for having engaged. Opposed the discipline. Well, on February 5th, he complained that the paperwork was wrong to both Mr. Torres and Ms. Lima when they gave him the discipline for having used a fifth day or having accumulated five points for using his CFRA leaves. And at the very least, if they weren't going to give him that fourth day, then the fifth day was they could have done as an accommodation. Not only did he complain to Torres, he complained to Lima, he complained to the HR director, Scott, to dispute the warnings, and nobody ever got back to him. In fact, there's an email where they talk about, in the record, about making sure to follow up with him. He also complained weekly to his supervisor, Mr. Torres, and Mr. Torres says he would complain to me all the time, and I would go to Ms. Lima and tell her about that. And Ms. Lima, of course, is in the HR department. So here, Mr. Wilfong wasn't just saying, hey, I want a cot. Hey, I want an extra day. They actually disciplined for him, and he opposed that discipline. And so it's that opposition which makes this case like Castro Ramirez, which was decided in August. The opposition is a complaint that he made to Torres, Lima, and Scott. And where are those in the record? Those are at 5 ER, 1044, and 1035. And so I think those facts raise an issue about whether or not he did more or if he simply requested an accommodation. So I don't think we have to decide that, as a matter of law, he didn't do more. I think the question is, could a reasonable jury find that he did do more? And I think a reasonable jury, there is substantial evidence that raises that tribal issue of fact on that FIHA retaliation. So I hope that answered what the court's question was that we got last week. So we've got about four and a half minutes left, but I wanted to, and I did want to reserve a couple of minutes for rebuttal. I did want to make one point. These are all disputed facts, and the court has routinely talked about, in cases like Niagara v. Sears, and then there were a number of cases that were cited in Niagara v. Sears, that talks about it shouldn't take much for a plaintiff to overcome summary judgment. And here, I don't think it can reasonably be questioned whether or not there's a disputed material fact about whether or not Mr. Wilfong had a disability. And I think the defendants make much ado about his testimony where he says that it didn't prevent him. The standard under FIHA is not prevent, it's did it limit. And clearly, walking with a limp and having to take a whole day off of work a week is something that limits you in major life activities, such as walking and working. And so I think I've got about three and a half minutes left. I'd like to reserve that time for rebuttal. While I'm sitting at counsel table, Your Honor, I will make sure to find that site in the record where it says that Mr. Wilfong turned off the, to flip the switch. Okay, thank you. Thank you. Good morning. Good morning. Will you be the only one arguing? I will be the only one arguing. Okay, thank you. My name's Tim Anderson. I'm an attorney with Whittler Mendelsohn here today on behalf of Apelles, Tharco, and Boise Paper Holdings. I immediately want to disagree with something Mr. Aaron said surprisingly enough, which is these are all disputed facts. They're not all disputed facts. It is undisputed that Mr. Wilfong lay down on a conveyor without asking for permission, without asking for any alternatives. He went ahead and he did that, and he didn't lock it out. I thought that it was conceded that this was not a lockout, tagout violation per the manual. And as I read the briefs in the record, Tharco is arguing, well, it's in the spirit of lockout, tagout. It was in the training, and that was disputed. Correct. The lockout, tagout policy explicitly covers cleaning, repairing, servicing, and maintenance. And why it does that is because the machine needs to be de-energized and locked out so it can't be turned on while you're on top of the machine, in the machine, interacting with the machine in an abnormal way. And that's precisely what Mr. Wilfong did. But in the briefing, it was conceded it wasn't technically a lockout, tagout item, that it wasn't covered by the manual. You're correct. It's not covered by the manual. Is that correct? The manual does not say that you have to lock it out and tag it out before you lay down on a machine. All right, that's an easy yes. I'm sorry? That's an easy yes. Yes, yes. And then there was some dispute about whether the employees had been trained to recognize this type of activity or conduct as being a lockout, tagout violation. Is that correct? I couldn't disagree more with that, because the testimony of Mr. Wilfong was he agreed that they were trained to lockout and tagout all equipment to protect against accidental or inadvertent operation when such operation could cause injury to personnel. That's at 5 ER 1016, 1017. He also testified that he knew that when he came into contact with parts of the machine that could harm him if the machine was inadvertently operated or turned on. Did he say that as to the particular machine that he was lying on? Correct, exactly. So he admitted that he knew he had to do something more on his machine than he did. Correct. Where is that in the record, please? That is at 5 ER 1016 and 1017. Pages are 90. Did he refer to the particular piece of equipment? Or are you just making an A? Maybe you could read to us exactly what he said. Or is that what you just quoted? That is the testimony regarding the policy. Regarding the machine itself, Mr. Wilfong actually testified there were three places on the machine that you could lock it out. And I think where the misunderstanding is coming in is that Mr. Arons, in the deposition of Mr. Harrington, repeatedly asked him, where do you lock out the rollers? And the rollers are part of the machine. It's connected to the machine. It's not a separate piece of the machine. It's connected to the machine. There's no lockout on the rollers because the rollers aren't energized. What happens is the machine, as the conveyor belt moves boxes along to go on to the rollers, then the rollers begin moving. So there's three spots Mr. Wilfong testified that he could have locked out the machine so you can't turn it on so that the conveyor belt wouldn't move boxes and items on to the rollers where he was laying. Can you read specifically where he says, I knew I should have locked out this machine or I could have locked out this machine? He said there's three places to lock it out. Could you read that or in the excerpt? He said, I think there were three for the whole thing when he was asked, could you lock it out? That's at page 5ER1021. And he admitted at 5ER1025 that because he didn't lock it out, the machine could have been turned on with the flick of a switch because what happens, you put the lock in there, you can't move the switch up. That's the purpose of the lockout. Because he didn't do that, the machine could have been activated as he lay there. But your own expert didn't even know that, right? Our own expert was asked repeatedly whether you could lock out the rollers. And you can't lock out the rollers. The machine is what should have been locked out. But if you call the most knowledgeable person and they can't say what they know that you should have done, isn't there some sort of tribal issue or ambiguity about that? You're kind of carefully parsing things, and we're saying exactly where it is, and then you back up a little because what you just said isn't exactly what you're reading back. But I think if you look at the testimony. It was just rollers. It was not part of the conveyor system. I don't have the exact pages, but my notes and my recollection from reading the record is, he said at least where he was lying, he covered the optical eye. There was no way that there could be movement. So if there was an ability to lock out the machine somewhere else, I mean he clearly disputed that there was anything that he needed to lock out where he was actually lying. And your expert didn't dispute that. He didn't say that it was a lockout-tagout violation of the sort characterized by the manual. So I'm not understanding why you're now going back on a concession that seemed fairly clear in the briefing. What Mr. Harrington testified to was an obvious lockout-tagout. And then he was asked by Mr. Ahrens, is it covered by the express terms of the policy? And he testified it was not. It was instead covered by the training. And I think that snippet I read to you from Mr. Wolfong's deposition shows that he understood from his training, if you are going to get onto a machine and lay on it, you need to lock it out and tag it out. Well, that's your interpretation of it. I didn't see any clear statement in his – I didn't see him making a clear statement that he had been trained, that that particular piece of equipment was subject to the lockout-tagout policy with respect to lying on the rollers. In fact, my recollection and my notes indicate he said he did not have that training, that there was a dispute as to the training. There was – I mean, he was – You're making a jury argument right here. We're talking about summary judgment. And we're talking about you've got to give all inferences to the side that summary judgment's against. So that's a jury argument you can make, and that's what you're making right here. But doesn't that take it right to the fact that there's a tribal issue? I don't believe so because I think the Ninth Circuit in Courtsville, California – I mean, you're stating the evidence in terms of the light most favorable to you. And we have to look at it in the light most favorable to the appellant. If you look at the light most favorable to the appellant and assume that the lockout-tagout policy did not expressly cover what happened, there's still a question of interpretation of the policy and how you apply the policy. In Courtsville, California, the Arteaga decision have repeatedly said that neither juries nor plaintiffs have the right to take away that right from employers to interpret their policies as they see fit. Right, but you don't immediately suspend them right after. It takes a while, and you have to ascertain whether, in your view, you think that there is this violation. So it wasn't perfectly obvious to the employer at that moment, and so then suddenly two weeks later and now here, it's perfectly obvious. And there's no other way that you can look at it. I'm not saying you don't have the best litigation position, but this is summary judgment. Right, and I think as to that point, what occurred was the three supervisors found him. And from a supervisory position, it's not their position to determine what sort of violation it is. They're to provide the facts to the plant manager and to HR, and that decision is up to the plant manager and HR, and that's exactly what they did. They provided three separate statements that went to HR, the plant manager, who conferred with David Harrington, and they decided if you lay on a conveyor at work and you don't lock it out and tag it out. So that's your legitimate non-discriminatory reason, and then Mr. Wilfong presents evidence that it's not covered by the manual and that there's some smoking gun email saying we hate this FMLA policy, people are abusing it, we need to fight it. So genuine issue material fact as to whether it was pretextual, since it's not precisely covered by the manual. Well, with respect to the comments by Ms. Lima, first of all, and Mr. Stingley, they weren't involved in the termination decision. I think those are straight comments, and they're straight comments that, with the exception of Ms. Lima's comment, didn't relate directly to Mr. Wilfong. Ms. Lima did say that she thought he was abusing his FMLA, but that was because he was exceeding the number of absences set forth in his certification form. I have a note. Perhaps this is wrong, but in June 2013, Mr. Aguirre, the plant manager, complained to Lima and Stingley about six FMLA cases, including Mr. Wilfong's, and he wanted the corporate to challenge it, he said. And then, according to my notes, Mr. Aguirre is a person who signed the termination notice, so was a decision-maker on that. Correct. He was definitely a decision-maker in terms of the termination decision. I believe what he said was not referencing Mr. Wilfong's case specifically, but in general what the testimony was was that he said they have a disproportionate number of FMLA leaves at the facility where Mr. Wilfong worked, and he wanted the employer, HR, to challenge some of them to the extent possible. And there certainly are mechanisms under the FMLA where employers can very lawfully and legally challenge FMLA leaves, whether it's a recertification, a second opinion, a third opinion. But he disputes when he was told about the recertification, too. Right. And so we can't just take your word as that right there, that your employee says that he was told to get recertification at a certain point. He puts it down the line as far as that. So, I mean, right there, that... Well, if I can address that for a moment. Ms. Lima testified in her deposition unambiguously that she told him on February 5th, when he got his written and verbal warnings, that he needed to provide additional medical documentation. Right. What did he say? And he said in response, quote, I don't remember what she said. I was pretty mad about why she didn't tell me beforehand what was going on. That's at 5 ER 1045. Did she request him to get a recertification? As I recall, she said she couldn't recollect. Did she say, if you get it recertified so that there's an estimated five days instead of four days or whatever it was, then you could have the extra time? But I didn't see anything in the record that she told him that. The recertification word was not used. But what she testified in her deposition is that she asked him for additional medical documentation. That's at 4 ER 716. And so I don't think his lack of recollection of a conversation can create a material issue of fact when she unambiguously testified, I asked him for that additional medical documentation on February 5th. In addition, though, Mr. Wilfong testified in his deposition that at some point she did ask for additional medical documentation. He was also asked, did he know on February 5th if he needed to provide additional medical documentation? And he said, I asked her, why didn't she tell me in the first instance I didn't have five days instead of letting it go for so many months? He was asked, and at that point you were aware the medical documentation said four days per month? Yes. So you were on notice what was going on, correct? Yeah. So he both, I believe, implicitly and explicitly knew on February 5th that he had to provide additional medical documentation if he wanted to go beyond four absences per month. And he admitted that he didn't do that. He admitted that he didn't seek any additional certification until his initial certification expired in July. And so from that perspective, I think that THARCO certainly requested recertification and did not get it from Mr. Wilfong. Your view is based on, well, we can review the evidence just as you can, but your view is that's undisputed. My view is that's undisputed. It's undisputed in the context that if he can't remember what she said during that conversation and she testified, hey, I told him on February 5th you had to do this, I don't think that creates an issue of fact to defeat summary judgment. Beyond that, during that conversation with Ms. Lima, he was on notice, like I said, both implicitly and explicitly that he needed to provide that additional leave. He failed to do so, and there was no requirement for Ms. Lima to put that in writing. I know opposing counsel argues it has to be in writing. If you look at the CFRA, there's no requirement that a request for recertification needs to be in writing. It simply says that once the originally estimated amount of time for leave expires, you can ask for recertification. I'm sorry, I'm looking at my notes, and it says that Lima testified she could not remember whether she had informed Wilfong that he would have to provide recertification from his doctor if he wanted to take up to five days of leave per month rather than four days. Is that wrong? I believe that's the citation I have is for ER 716, pages 7 through 18, I'm sorry, lines 7 through 18, in which she told him on February 5th, which is when he received the verbal and written warnings, that he needed to provide additional medical documentation if he was going to take over five, I'm sorry, over four absences per month. And then in terms of the rope and more decisions, I don't believe that simply saying something is unfair constitutes protected activity under FEHA. You actually have to oppose discriminatory conduct, and there certainly was no complaint then or at any other point by Mr. Wilfong that he was in any way being retaliated against or discriminated against. Did he ever oppose his suspension for points? I do not believe he filed a grievance with respect to his suspension for points. He did his termination, and I believe his testimony was he could not recall if he did or did not. So your opposition equals grievance, otherwise you can't oppose. What's your best case on that opposition has to be a filed grievance? I don't think opposition needs to be a filed grievance, but I do think opposition needs to be specific opposition to discriminatory, retaliatory conduct. That's what protected activity is versus, hey, this is unfair. Did he not challenge when he was suspended for points? Again, I do not believe he filed a grievance. All right, but did he challenge it? I asked, does challenge equal grievance? You said no. Did he challenge that? I do not believe the record is clear as to whether he made any sort of a challenge to Ms. Lima when he was given his suspension in July. Okay. Is anyone on the panel? Do you have any additional questions, Judge Bea? No thanks. All right. Your time has expired. Thank you, Your Honors. We've actually taken you over. Thank you. You've got it exactly right. That's awesome. To answer your question, where in the record does, if I may proceed. Go ahead. Thank you. Thank you, Your Honors. Mr. Wilfong testified in 5 ER 1019 and 1020, which is pages 104 and 106 of his deposition, that he had turned it off. Not only did he testify to that, but John Ness, the supervisor who saw him at first and then went to get other supervisors and came back, testified that it was shut off, the switch was shut off as well, which is 4 ER pages 837 to 838 in the record. So, yes, there is evidence in the record that he did turn the machines off. There was also a question about whether or not he had told anybody what he was going to do. In fact, in the record, Mr. Wilfong testified, 5 ER 1024, that he told his supervisor, Mr. Dean, that his back was bothering him so much that he planned on laying down. And in the record, Mr. Wilfong testified that he had done this on hundreds of occasions before and no one had ever said anything to him. Opposing counsel says that Mr. Wilfong acknowledged that he had been trained, that that use of the, that this machine was subject to the lockout, packout policy and using the machine in this way would be a violation. Yeah, I know that's what they said. But all of the, and we addressed this at length in our reply brief, everything that is cited by the, by THARCO about what he conceded, what he conceded is the general policy. He actually disputed whether or not this, what he did was a violation of the lockout tagout. And that is pretty clear, I think, from the record. I brought so much stuff up and I actually needed more. And so there was not only that, but when it was represented that all the supervisors knew it was a lockout tagout, in fact, that's also not true as well because all the supervisors testified that their training for lockout tagout says that if they see something that they even suspect might be a lockout tagout, they're supposed to immediately remove that person from the floor and immediately suspend them. Mr. Wilfong, after they told him to get down, they all just left. And he testified that he went ahead and he laid down right there on the floor and he finished working that shift and then the next two shifts. And it's only after, I believe, Mr. Geary, with his discriminatory and retaliatory animus about people who use FMLA, decided that this was an opportunity that they could take, frankly, an ambiguous and unclear policy as to whether or not this fell within that policy and turn it into the harshest extreme, which is to terminate a 35-year employee. And so I think one of the things I kept hearing counsel talk about was what's implicit in this policy and our interpretation of this and our reading of these facts. And every time I was hearing that as I was sitting there, I kept thinking to myself, you know, that's your position. That's not summary judgment. We have to look at what's implicit and what the reasonable interpretation is in the light most favorable to Mr. Wilfong. And that's what I began with here this morning, which is the district court basically parroted everything that Tharco's position was and that there are disputes of fact in regards to his disability, in regards to the certification issue that you all addressed at length, and in regard to that certification. Mr. Wilfong, we addressed this in our reply brief as well on page 7, that it's very clear that the first time he said that he heard anything about recertification was in July at the time that he was suspended. And there's also an email where they're following up about this recertification, which is a March 11, 2013 email by Ms. Lima. And it says nothing in there in that email saying of a need that she told him he needed recertification, just that in her reading of the doctor's notes, he gets four days and not five days. And that's at 4ER757. That email is Exhibit 59. I'm going up now, so I think my time is up. Let me make sure. Judge Bea, do you have any additional questions? No further questions. We don't have any additional questions. Thank you both for your argument. This matter will stand submitted. Thank you for your time and for listening to our positions. I appreciate it. Thank you.
judges: Callahan, Bea, Ikuta